577 So.2d 1046 (1991)
Ann MEXIC
v.
Simon MEXIC.
Simon MEXIC
v.
Ann MEXIC.
No. 90-CA-1304.
Court of Appeal of Louisiana, Fourth Circuit.
March 28, 1991.
*1048 Phillip A. Wittman, Dorothy H. Wimberly, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, and Peter J. Abadie, Jr., Metairie, for appellant.
Richard J. Tomeny, Jr., Metairie, for appellee.
Before KLEES, CIACCIO and LOBRANO, JJ.
LOBRANO, Judge.
The community of acquets and gains between Simon Mexic and Ann Mexic terminated on April 30, 1984. Pursuant to partition proceedings, the trial court allocated $1,050,334.05 in community assets to Simon, and $44,601.86 in assets to Ann. The court ordered that Simon be responsible for all community debts in the amount of $517,625.86. In order to equalize the net estates (i.e. $532,708.17 to Simon and $532,708.17 to Ann) the court ordered an equalization payment to Ann in the amount of $488,106.31. Further the court determined that Ann was due a net reimbursement from Simon of $96,693.23 for community funds received by him subsequent to the community's termination.
This matter was initially tried before a commissioner in September and October of 1987. Despite exceptions filed by both parties, the commissioner's recommendations were adopted by the trial judge and made the judgment of the court.
Simon Mexic perfects this appeal asserting numerous errors. He supports the majority of his arguments with the report prepared by Richard Kelley, C.P.A., appointed by the court. For the following reasons, we reverse in part, amend and affirm in part the trial court's judgment.
Allocation of Community Assets and Liabilities:
Simon argues that the court erred in allocating substantially all of the community assets and liabilities to him. He urges that such an allocation violates the intent and spirit of La.R.S. 9:2801, as well as the legally preferable partition in kind. See, Taylor v. Taylor, 473 So.2d 867 (La.App. 4th Cir.1985).
La.R.S. 9:2801 sets forth the procedure to be followed when spouses cannot amicably agree on a dissolution of the community. Subsection 4(c) provides for the allocation of assets and liabilities by the court. It requires that "the nature and source of the asset or liability, the economic condition of each spouse and any other circumstances the court deems relevant" be considered in making the allocation. Where the allocation results in an unequal net *1049 distribution, the court may order payment of an equalizing sum.
In Ziegler v. Ziegler, 537 So.2d 1207 (La. App. 4th Cir.1989) this court recognized the correctness of allocating the majority of community assets to the husband with a large equalization payment to the wife. In doing so we relied on the trial court's conclusion that the wife did not possess the qualifications to act as a general partner of the various partnerships comprising the bulk of the community real estate. We recognized the special circumstances involved in real estate partnerships of which the community owned an undivided interest. Those circumstances supported the impracticability of either liquidating the community interests or awarding them to the wife.
In the instant case, the record is clear that Ann has no business expertise in any of the community partnership ventures. Prior to their separation Simon handled all of the community investments, including the various real estate partnerships. He arranged for the community financing and was actively involved in the management of those investments. Since their physical separation Simon continued to manage all the community business affairs. The trial court found that "she was unaware of their business dealings during the marriage."
Simon argues that Ziegler is distinguishable because, unlike Mr. Ziegler, he is not actively involved in the management of the partnerships. He urges that Ziegler was the general managing partner of partnerships in commendam, and thus it would have been impractical to allocate any of those interests to Mrs. Ziegler. He further urges that Mr. Ziegler had substantial separate property to satisfy an equalization payment whereas he does not.
We disagree. First, the Mexic community is a partner in ordinary general partnerships, not partnerships in commendam. The evidence supports the conclusion that, as an ordinary partner, Simon, not Ann, participated on behalf of the community in the business decisions of each partnership. In fact, part of the land on which Frenchman's Creek partnership development is constructed was contributed by Simon from his separate estate. Second, La.R.S. 9:2801 authorizes the court to order the execution of a note or mortgage on community property to satisfy an equalization payment. This authorization suggests to us that there is no legal requisite that separate property be available before an equalization payment is ordered.
Clearly, the trial court's allocation in this case is not only authorized by R.S. 9:2801, but is the most practical under the circumstances. Those community assets awarded to Simon are already in Simon's possession or under his control and have been maintained or managed by him in the past. It would be most impractical, if not impossible, to attempt either a liquidation or division of the community interests in the various partnerships.
We find no error in the trial court's allocation of community assets and liabilities.

Trial court erred in the valuation of the community's real estate investments
Simon argues that the court's valuation of the community interests in the Frenchmen's Creek and Cypress Ridge partnerships is erroneous because the court failed to consider tax consequences of a sale and marketability problems.

a) Tax consequences
The trial court valued the community interest in the Cypress Ridge and Frenchmen's Creek partnerships at $247,821.00 and $488,524.83[1] respectively. Simon argues these figures should be reduced by approximately $260,000.00 to reflect the tax consequences occasioned by the recapture of investment tax credits associated with a sale.
The trial court rejected this argument as speculative. We agree. The value of the community interests in real estate partnerships *1050 should not and cannot be predicated on tax consequences of some future uncertain event.[2]

b) Marketability
Relying on this court's observations in Ziegler that the valuations of an unliquidated undivided interest in real property is rarely as great as the mathematical percentage of the interest in the property's value, Simon argues the trial court failed to take marketability into account. In support he urges that Kelley's report showing a value of $210,600.00 for Cypress Ridge and a value of $399,917.00 for Frenchmen's Creek is correct because it takes into account a discount for marketability. The trial court's values are $37,221.00 higher for Cypress Ridge and $84,700.00 higher for Frenchmen's Creek.[3]
We note that Kelley's valuations were made as of December 31, 1986, over two years after the community terminated. We further note that Kelley's testimony suggests a reduction of 15% because of the inability to market the community interests. Kelley testified that the 15% discount would be appropriate if the property were sold to a third party. If the property remained with either party the discount factor would be inapplicable. It is clear that the court accepted Kelley's valuations without the discount factor. Adding 15% to Kelley's valuations results in $247,764.71 for Cypress Ridge and $488,513.07[4] for Frenchmen's Creek. These valuations are almost identical to those of the trial court. We find no error in disallowing the 15% "marketability" factor. The trial court's discretion in this respect was not abused.

Improper Calculations
Simon argues several calculation errors in computing the equalization payments to Ann. We address each separately.
First, Simon argues that because the community has a net value of $577,310.03, Ann is entitled to one-half, or $288,655.02. Since she is allocated assets valued at $44,601.86, his equalization payment, before any reimbursable claims should be $244,053.16, not $488,106.31. We agree.[5]
The trial court's judgment is structured so that Simon pays all community debts. His net asset allocation after payment of those debts was computed to be $532,708.17. The trial court then reasoned that Ann should receive the same amount and ordered an equalization payment of $488,106.31 taking into account the $44,601.86 in assets already allocated to her. This was error. The net effect of this holding is to require Simon to either give Ann the majority of the net assets he received or "manufacture" an additional four hundred eighty eight thousand dollars in community assets. This is clearly not the intent of La. R.S. 9:2801. That statute authorizes asset allocation between spouses with an equalization payment where there are unequal values. It does not authorize a court ordered increase in the total community value. The community is fixed as of the date it is terminated. It cannot be increased by judicial decree.
The reasoning is consistent with the holding in Ziegler v. Ziegler, supra. There the equalization payment was predicated on one-half the value of the total community, not the asset allocation to the husband. The proper procedure is to first compute the community's net value. Each party is to receive one-half of that value. The value of the assets allocated to each party is then deducted from the one-half they are entitled to. The equalization payments are then determined.
*1051 Using the trial court's figures, the computation in the instant case should be as follows:

Total Community $1,094,935.91
Less Debts 517,625.86
 _____________
Net Community 577,310.03
One half to each $ 288,655.02

Simon receives net assets of $532,708.17, or $244,053.15 more than he is entitled to, while Ann is allocated $44,601.86, or $244,053.15 less than she is entitled to. The solution is payment by Simon to Ann of that amount.
Simon urges mathematical errors. The State Investor's Account NO. XX-XXXXXX-X had a Zero balance on December 31, 1986, however the trial court's $17,436.39 value was as of the date the community terminated. The same is true for the note receivable from Mexic Bros, Inc., the 1978 Peugeot, and the tax free bond cashed by Ann. The note payable to Rosina Mexic (Simon's mother) was determined to have a balance owing of $93,378.34, a community debt. Simon asserts the correct balance is $262,288.55 as per Kelley's report. The court, however, found that the note dated December 28, 1972 was in the original amount of $150,000.00 representing the balance of the purchase price of real property from the Succession of Perry Mexic. The reverse of the note contains several notations indicating payments of $56,621.66. The court further found that since neither Simon nor his mother could explain these notations, that amount was credited against the principal leaving a balance of $93,378.34. We find no error in this computation or factual conclusion.
Next, Simon argues that certain other community assets are non-existent. In particular, he argues that the E.F. Hutton account ($16,177.89), State Investors Account No. XX-XXXXXX-X ($17,436.39), the note receivable from Mexic Bros. Inc. ($80,600.00) and the First National Bank of Commerce Certificates of Deposit ($20,380.22) were all liquidated at the time of trial with their proceeds being used to satisfy community obligations. His argument has no merit. The trial court was correct in assigning the values as of the date the community terminated, not the date of trial. Furthermore, Simon fails to specify or show, nor does the evidence support, that these particular items were used to satisfy existing community obligations.
Simon complains that Kelley's report shows household furnishings totaling $57,567.00 and that the trial court failed to include or even mention them. He argues that Ann received the "great majority" of those and therefore he should receive a credit. The commissioner's reasons state "[a]fter trial the parties reached an agreement regarding the majority of household furnishings and effects." In brief, Simon states the agreement was made before the partition trial. The record is void of any evidence as to which items Ann received. We therefore have no evidence to make an allocation. Simon bore the burden of proving which of those items were in Ann's possession and their respective values. We find no abuse of discretion.
Three personal items which Simon asserts the trial court erred in its allocation were a diamond ring he gave Ann, decreed to be her separate property; a Rolex watch held by Simon for his cousin's son and which Simon lost, the replacement cost of which was decreed to be a community obligation; and a glazed urn and pedestal which the court decreed to be community.
La.Civil Code Article 2340 provides for the presumption of community for those things in the possession of either spouse during the existence of the community. With respect to the diamond ring, we will not disturb the trial court's factual conclusion that Simon gave the ring to Ann and thus is her separate property.[6] We further find no error in the court's conclusion that Simon failed to overcome the presumption that the glazed urn and pedestal were community.
With respect to the replacement of the lost Rolex watch, the court concluded that the funds used to replace it were community *1052 funds and that Simon was bound to reimburse the community. There is insufficient evidence to substantiate that Simon used his separate funds to replace the watch, thus his claim for reimbursement was denied. We find no clear error in this ruling.
The trial court ordered Simon to reimburse Ann the sum of $96,693.23[7] representing one-half of the community funds he collected since the separation. Simon admits reimbursement is due for several of the items, but contends that the remainder was used to pay community obligations thus no reimbursement should be due. However he does not specify with any particularity in his brief which obligations were satisfied other than mentioning the line of credit at First National Bank of Jefferson. His reference to particular testimony and Kelley's report, however, does not substantiate which community funds were used to pay which community debts, other than the following.
The trial court determined that Simon received a total of $275,951.86 in distributions from Cypress Ridge and Frenchmen's Creek partnerships. The court then determined that $254,685.52 in payments to these two partnerships were made on behalf of the community. The net of $21,266.34 was included in the reimbursable items due Ann. In addition, the court also included an $11,502.56 distribution from Woodmont Partnership. Thus the total net reimbursable distributions from the Partnerships were calculated at $32,768.90, onehalf of which is due Ann.
We agree with Simon's argument that the court miscalculated these amounts. First, the total distributions received from all three partnerships is $272,534.42.[8] The trial court's total is incorrect because it includes the Woodmont partnership twice. The correct computation should be:

Total received from all three partnerships: $272,534.42
[9] Less: Paid on behalf of the community: 255,348.35
 ___________
 Net: 17,186.07
 ½ 8,593.04

Thus the total amount of reimbursement due Ann should be reduced by $7,791.41 the difference between what the trial court awarded ($16,384.45) and what we award ($8,593.04) for the partnership income.
Next, Simon argues he is entitled to reimbursement for a $7,500.00 payment he made to the John Santopadre Building and Agular Group in an attempt to avoid an investment tax recapture. He asserts he acted as a prudent administrator and is entitled to reimbursement. The court found that Simon had no obligation to make the payment and thus was not entitled to reimbursement. The building was sold by him in 1986. We find no clear error in this regard.
The trial court concluded that neither Simon nor Ann had a legal obligation to support their son, Scott Mexic at Boston University. Despite Simon's argument to the contrary, we find no error in the court's factual finding that "Ann Mexic denied that she and Simon Mexic reached an agreement to support Scott. Mr. Mexic's testimony on this issue was uncorroborated and not convincing."
Kelley's report shows several life insurance policies owned by Ann which were either cashed in or rolled over. The trial court held that there was insufficient evidence to show the amount of community funds used in premium payments and therefore ordered no reimbursement to the community. Simon argues that Ann owes *1053 one-half of the cash value she received since the policies were community property. We agree. Based on Kelley's report, we determine the following as community funds received by Ann, one-half of which is due Simon.[10]

New Your Life Policy # 25512797 $1,073.89
MONY Policy # 8458844 1,111.46
MONY Policy # 9385817 2,304.16
MONY Policy # 9907573 811.06
MONY Policy # 10720856 808.83
 _________
 Total $6,109.50
 ½ due to Simon $3,054.75

Simon claims reimbursement for house insurance, taxes and repairs. The trial court properly denied these because they were part of the support payments Simon was ordered to pay in previous judgments dated September 24, 1984, May 10, 1985 and May 20, 1986. The court made the same conclusion with respect to the Visa bill paid by Simon and other pre-April 10, 1984 bills. The trial court supported its conclusions by reference to the payees of the checks. We find no error in holding that those were obligations covered by the support decrees in favor of Ann.
We find error in the trial court's conclusion that the $16,641.00 loan from the Whitney Bank was not a community debt. The funds were borrowed prior to the termination of the community.[11] The fact that Simon may have subsequently paid off the loan does not alter the character of the debt. An obligation incurred during the community is presumed a community debt. La.C.C. Art. 2361. There was no evidence to rebut this presumption. This debt should have been included as a community liability.
Simon also asserts that the proceeds of a Whitney Bank loan in the amount of $174,500.00 were used to pay off a community debt to First National of Jefferson (FNJ) and therefore should be considered a community liability. The loan in question was obtained on September 29th or 30th, 1987, immediately prior to trial, and is clearly not a community obligation. The uncontested community obligation to FNJ as of April 30, 1984 was $324,797.16. This amount was included in the community liabilities to determine the net community assets allocated to Simon. Therefore, irrespective if the funds subsequently borrowed from Whitney were used to reduce that obligation, Simon received the benefit of the full FNJ debt when computing his equalization payment to Ann. The community assets were reduced by the correct community debt.
Simon next argues that Whitney Accounts 3949495 and 39494105 and Security Homestead Account No. XXXXXXXXX were not allocated by the trial court and should be presumed community. The testimony cited by Simon in his brief to support this contention makes no reference to the Whitney accounts,[12] nor can we find them on Kelley's report. The Security Homestead Account is mentioned, but Kelley's report shows it had a zero balance as of April 30, 1984. Under these circumstances we agree with the trial court that there is insufficient evidence to make any determination.
Finally we find no error in the court's failure to include the Whitney loan to Mexic Brothers and the promissory note payable to Daniel Robinowitz as community liabilities. The Whitney note is clearly a contingent liability of the community, and it would be impossible to determine its value. By Simon's own admission in brief the Robinowitz note was not funded during the community, thus the community has no obligation to pay it.
For the above and foregoing reasons, we reverse in part and amend the trial court judgment to increase the community liabilities *1054 by $16,641.00 (the Whitney loan); we decrease Simon's reimbursement to Ann by $7,791.41 (the partnership net distribution) and we increase Ann's reimbursement to Simon by $3,054.75 (the cashed in life insurance policies), and we recompute the equalization payment by Simon as discussed above.
Accordingly we enter the following decree:

DECREE:
Total Community Assets $1,094,935.91
Less Community Debts 534,266.86
 _____________
 Net Community $ 560,699.05
One half to Each $ 280,334.52
 _____________
Equalization payment due
Ann Mexic $ 235,732.66
($280,334.52 less $44,601.86)
Net reimbursement due Ann Mexic $ 85,847.16
Credit due Ann Mexic 1,474.98
 ____________
 Total Due Ann Mexic $ 323,054.80

REVERSED IN PART, AMENDED AND AFFIRMED IN PART, RENDERED.
NOTES
[1] The Frenchmen's Creek valuation reflects a reduction of $76,075.17 representing the reimbursement of Simon's separate estate for the value of his separate real property contributed to that partnership.
[2] Simon's reference to his expulsion from Frenchmen's Creek partnership on March 30, 1990 is outside of the record in this matter and cannot be considered by this Court.
[3] This figure takes into account the fact that Kelley's report shows Simon's claim for separate property reimbursement at $79,983.00 while the correct figure is $76,075.17. Thus the difference in the value is reduced by $3,907.83.
[4] The Frenchmen's Creek valuation is computed by taking the base figure of $399,917.00 and adding $79,983.00 (which is Kelley's value for Simon's separate property), then adding 15% to that total, then deducting $76,075.17, the trial court's value of Simon's separate property.
[5] For purposes of discussing this argument we use the trial court's figures although they are adjusted to a certain extent for reasons assigned later in this opinion.
[6] In the same finding, the trial court also concluded that the large diamond ring possessed by Simon was his separate property being a gift from his father.
[7] This figure is net of the reimbursement owed by Ann to Simon. (i.e. Simon owes Ann $107,604.11; Ann owes Simon $10,910.88)
[8] We recomputed, from Kelley's report the total distributions from all three partnerships and arrive at a figure approximately $3,500.00 less than the trial court.
[9] We recomputed the amounts paid by Simon based on the commissioner's reliance on plaintiff's exhibits 20 and 22 and arrive at this figure, slightly higher than that of the trial court.
[10] These figures include the tax withheld by the respective companies and include the policies owned by Ann and cashed in by her.
[11] In brief, Ann admits the funds were borrowed prior to the filing of the petition for separation, and the obligation existed on that date. Further, Kelley's report shows the Whitney loan on April 30, 1984 at $16,641.00.
[12] Other Whitney accounts are discussed, however.