NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 CA 1047

DARLENE MORRIS FAIR

VERSUS

STEVEN JOSEPH FAIR

Judgment rendered: JUL 1 9 2022

* * * * *

On Appeal from the
Family Court of
East Baton Rouge Parish
No. 204309

The Honorable Pamela J. Baker, Judge Presiding

* * * * *

Barbara Lane Irwin
Megan L. LeBlanc
Gonzales, Louisiana
Marcus T. Foote
Baton Rouge, Louisiana
and
Mark D. Plaisance
Marcus J. Plaisance
Prairieville, Louisiana

Attorneys for Defendant/Appellant
Steven Joseph Fair

Lisa Leslie Boudreaux
Michael Sean Walsh
Ryan K. French
Baton Rouge, Louisiana

Attorneys for Plaintiff/Appellee
Darlene Morris Fair

* * * * *

BEFORE: GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.

**HOLDRIDGE, J.**

This appeal in a community property partition concerns the valuation of a community property corporation, the allocation of gains and losses on the separate property portion of an IRA, and a reimbursement distribution. We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

Darlene Morris Fair and Steven Joseph Fair were married on May 24, 1997. On April 19, 2016, Ms. Fair filed a petition for divorce and incidental matters. The parties entered into a stipulated judgment on September 26, 2016, wherein, among other matters, they terminated the community regime retroactive to the date of filing the divorce petition pursuant to La. C.C. art. 2374(C).[1] On May 30, 2017, Mr. Fair filed a petition for judicial partition of community property pursuant to La. R.S. 9:2801, and Ms. Fair responded with an answer, a reconventional demand, and requests for injunctive relief and an accounting. On October 11, 2017, the court signed a judgment of divorce.

The major issue in the community property partition involved Surgical Imaging Specialists, Inc. (SIS), a Louisiana Subchapter S-corporation that the parties formed in 2002 during the community regime. SIS is a contracted distributor of GE Healthcare (GE) through OEC Medical Systems for the exclusive sales and distribution of GE surgical imaging equipment, mainly C-arms, used in operating rooms to assist doctors with their procedures using x-ray. Since 2002, GE and SIS had entered into an annual written distributorship agreement setting forth an

---

[1] Louisiana Civil Code article 2374(C) states, "When a petition for divorce has been filed, upon motion of either spouse, a judgment decreeing separation of property may be obtained upon proof that the spouses have lived separate and apart without reconciliation for at least thirty days from the date of, or prior to, the filing of the petition for divorce." Louisiana Civil Code article 2375(A) provides that a judgment decreeing the separation of property terminates the community property regime retroactively to the date of filing the petition or motion for separation of property.

2

exclusive geographic area that SIS would operate in. The agreement had been renewed or extended annually. SIS receives a commission for every covered GE device purchased in its territory. The actual transaction is between GE and the customers, which are hospitals, surgery centers, and physicians' offices. GE trains the customers, installs the equipment, and services it.

Mr. Fair is the sole registered shareholder of SIS and its president. Before forming SIS, Mr. Fair was a sales representative for an area distributor of GE medical imaging equipment. SIS's sales force initially consisted of Mr. Fair and one other individual in 2019, but SIS had grown to employ seven full-time salespeople and one part-time salesperson. Mr. Fair's duties shifted from sales to the management, training, and assigning of the sales force. SIS's sales territory initially included Louisiana, Arkansas, and the Mississippi Gulf coast, but grew to include Texas, although while losing Arkansas.

Ms. Fair officially served as SIS's secretary and treasurer and was recognized as an equal owner of the business on all corporate tax filings. Beginning in 2004, Ms. Fair worked for SIS handling administrative tasks.[2] SIS hired a certified public accountant to prepare its tax returns based on documents provided by Ms. Fair, and it also hired a secretary and an administrator in later years who filed orders and processed quotes. Mr. Fair and Ms. Fair earned the same pay. On May 5, 2017 Mr. Fair terminated Ms. Fair.

Mr. Fair filed a petition to partition the community assets in 2017. The court held hearings on several dates to adjudicate the parties' claims. On January 24, 2019 and February 14, 2019, the court heard the parties' claims as to SIS. The court issued

---

[2] Ms. Fair testified that she worked on post-sale tasks, payroll, accounts payable, accounts receivable, bookkeeping with QuickBooks, payment of business expenses, and compliance with sales and payroll tax regulations for the various states within SIS territory. She testified that she set up all of the files and liability insurance and made sure that the 401(k)s were funded.

oral reasons for judgment at the conclusion of the hearing and then signed a judgment on March 13, 2019, wherein it awarded all of the community interest in SIS to Mr. Fair, excluded 25% of SIS's overall goodwill value from the partition as the personal goodwill of Mr. Fair, and found the base valuation of SIS as calculated by Ms. Fair's expert witness, Mr. Field, to be $2,400,000.00. After removing Mr. Fair's personal goodwill ($546,603.25), the court found the fair market value of Ms. Fair's community interest in SIS to be $1,853,396.25.[3] Ms. Fair's one-half interest in SIS was one-half of that amount, or $926,698.13. The court also ordered that Ms. Fair was to be reimbursed in the amount of $156,000.00 for certain additional salary payments that SIS made to Mr. Fair in 2017 and 2018.

After a hearing on February 5, 2020, to partition the remaining items of community property and to determine an appropriate partition, the court signed a judgment on June 16, 2020, which listed the allocation of SIS to Mr. Fair in the amount of $1,853,396.25. Among other items, the judgment also listed the amount of $27,082.68 in Mr. Fair's Morgan Stanley IRA account as his separate property that was excluded from partition. The judgment then stated that after the deduction of Mr. Fair's separate property of $27,082.68, the remaining amounts in his Morgan Stanley IRA account were to be divided equally by a qualified domestic relations order (QDRO).[4]

The court held a final hearing on the outstanding reimbursement claims on January 27, 2021, and signed a judgment on March 3, 2021. The court ruled that with respect to the $27,082.68 credit awarded to Mr. Fair in connection with the

---

[3] While the court in the judgment fixed the goodwill value at 25%, it did not use the $2,400,000.00 base valuation of SIS to calculate the actual goodwill amount. Rather, the court based its goodwill calculation on the 2017 information on SIS to determine that 25% of SIS's valuation was $546,603.25.

[4] The judgment specifically states that it is an interlocutory judgment.

4

partition of the Morgan Stanley IRA account, he was not entitled to the gains or losses after the termination of the community regime. The judgment then states, "The credit awarded shall accordingly be applied as of the approximate date of the account's division, with the remaining balance divided in-kind equally between the parties."

The court signed a final judgment on April 15, 2021, wherein it incorporated the previous judgments by attaching and making them a part of the final judgment. Mr. Fair appeals from that judgment.

On appeal, Mr. Fair contends in his first assignment of error that the court erred in its valuation of SIS by undervaluing a goodwill discount and failing to apply any lack of marketability discount whatsoever even though it was endorsed by both experts. In his second assignment of error, Mr. Fair contends that the court erred in classifying as community property the fruits of Steven's separate property after the termination of the community property regime, specifically as to its allocation of the Morgan Stanley IRA account. In his third assignment of error, Mr. Fair contends that the court erred in awarding Ms. Fair a reimbursement distribution of $156,000 for additional salary payments SIS made to Mr. Fair.

## STANDARD OF REVIEW

The trial court's allocation or assigning of assets and liabilities in the partition of community property is reviewed under the abuse of discretion standard. **Abreo v. Abreo,** 2021-0528 (La. App. 1 Cir. 12/22/21), 2021 WL 6069448 at *3; **Berthelot v. Berthelot,** 2017-1055 (La. App. 1 Cir. 7/18/18), 254 So.3d 800, 808. In community property partitions, the trial court is granted much discretion in valuing and allocating assets and liabilities and is required to consider the source and nature of each asset or liability, the financial situation of each spouse, and any other relevant circumstances. See La. R.S. 9:2801 *et seq.*; **Berthelot,** 254 So.3d at 808. Given this

5

great discretion, the trial court is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. **Berthelot**, 254 So.3d at 816.

A trial court's factual findings and credibility determinations made in the course of valuing and allocating assets and liabilities in the partition of community property may not be set aside absent manifest error. **Berthelot**, 254 So.3d at 806. A trial court's finding regarding the nature of property as being either community or separate is a factual determination subject to the manifest error/clearly wrong standard of review. **Benoit v. Benoit**, 2011-0376 (La. App. 1 Cir. 3/8/12), 91 So.3d 1015, 1021, writ denied, 2012-1265 (La. 9/28/12), 98 So.3d 838. Where one or more legal errors by the trial court interdict the fact-finding process, the manifest error standard is no longer applicable. The standard of review for mistakes of law by the trial court requires the appellate court to engage in a *de novo* review of the entire record and render a judgment on the merits. See **Rosell v. ESCO**, 549 So.2d 840, 844 n.2 (La. 1989); **Berthelot**, 254 So.3d at 807.

It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. **Trahan v. Trahan**, 2010-0109 (La. App. 1 Cir. 6/11/10), 43 So.3d 218, 228, writ denied, 2010-2014 (La. 11/12/10), 49 So.3d 889. The effect and weight to be given expert testimony is within the broad discretion of the trial court. **Id**. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its discretion. **Id**. at 229.

## VALUATION OF SIS

In his first assignment of error, Mr. Fair contends that the court erred in failing to apply a lack of marketability discount and in undervaluing the goodwill discount

6

in determining the fair market value of SIS. At the hearing on valuation, both parties presented experts who testified that fair market value is the price at which property could change hands between a willing seller and a willing buyer when neither is under compulsion and when both have reasonable knowledge of the relevant facts, acting at arm's length in an open and unrestricted market. Both experts used the income approach to determine the fair market value of SIS.[5] The income approach is based on the principle that the value of a business is equal to the present worth of the future benefits of ownership and the capitalization of cash flows method can be used to calculate it.

Ms. Fair presented testimony from Madison Field, who was admitted as an expert in business valuation and business financial analysis.[6] Mr. Field testified using the income approach, he valued SIS at $2,400,000, which represents the value of a 100% interest in SIS, including personal goodwill and before the application of any discounts.[7] He estimated that Mr. Fair's personal goodwill accounted for 10 to 30% of SIS's goodwill value.

---

[5] Ms. Fair's expert, Madison Field, and Mr. Fair's expert, John W. Theriot, both testified that in valuing SIS, they followed the guidance from the Statement on Standards for Valuation Services issued by the American Institute of Certified Public Accountants. Mr. Field followed the professional standards of the National Association of Certified Valuators and Analysts (NACVA). Mr. Field interviewed Ms. Fair twice; reviewed a QuickBooks file and information she provided; and reviewed Mr. Fair's deposition. Mr. Field gathered information from discovery, industry publications, SIS's financials, management interviews, an examination of contracts, and certain other factors. Mr. Theriot reviewed tax returns, financial statements, QuickBooks files, and depositions, and interviews of Mr. Fair and Mr. Kendell. Among other items, Mr. Theriot also considered business valuation data from prior cases, salary information from the Economic Research Institute, an industry publication, and local economic resources.

[6] Mr. Field has a bachelor's and master's degree in Business Administration with a concentration in finance. He is a Certified Fraud Examiner and a Certified Valuation Analyst. As an employee of Postlethwaite & Netterville APAC, he is associate director in the forensic and transaction advisory role. He testified he primarily performed business valuations, forensic financial analysis, and investments analysis.

[7] Mr. Field testified that the market approach, which compares the subject to similar businesses, yielded a value of $2,457,244.00, which supported the value yielded by the income approach.

Mr. Field testified that he determined the fair market value of the community interest in SIS with and without valuation adjustments as of December 31, 2017. According to Mr. Field, it is typical to value the community's full interest in the business. Mr. Field testified that he considered three categories of discounts: a discount for lack of control (minority), a discount for marketability, and a discount for lack of liquidity. He testified that minority and marketability discounts did not apply in this case because Mr. Fair owned 100% of the company whereas minority and marketability discounts deal with noncontrolling or minority interests. Mr. Field testified that customer-dependence and the risk of contract non-renewal were factored into the enterprise capitalization rate used for the base valuation, and were not factors relating to a marketability discount. Mr. Field testified that he used an elevated capitalization rate of approximately 16% due in large part to SIS's dependence on the GE one-year distribution contract.

Mr. Field testified that he used 10% as the liquidity discount but that "it may not be appropriate to apply the discount" because "there [was] no actual contemplated transaction." He explained that the liquidity discount would be appropriate to use where there was a "hypothetical willing buyer, arms[-]length transaction, neither is under compulsion to act." The court questioned Mr. Field about the minority discount and the marketability discount as follows:

> THE COURT: So, I'm understanding that the minority discount and the, marketability discount are two different things. What is – you're saying the difference between a marketability discount and a liquidity discount is just the liquidity discount is applied when the party owns 100 percent of the company. Is that correct?
>
> MR. FIELD: Yes, ma'am.
>
> THE COURT: All right. So, in this particular case, there is no minority, so there is no reason to give a discount because there's a hundred percent of the ownership is going to go to one person. It's invested in one person, right?

8

MR. FIELD: That is correct.

. . .

THE COURT: But why are you applying any liquidity discount, which I think people will use interchangeably with marketability, if this – there is no chance that this business is going to be marketed? This -- this business is going to, I mean, I guess that I'm –I'm likening it to why would I value the house less the real estate commission if there's no chance the house is ever going to be sold?

MR. FIELD: That's exactly why we presented with and without.... Is if you considered those circumstances, you just mentioned, it may not be appropriate to apply that discount; however, just underneath our practitioner's standard valuation theory, I'm obligated to provide the liquidity discount as part of our professional standards.[8]

Mr. Fair presented the testimony of John W. Theriot, who was accepted as an expert in business valuations.[9] Mr. Theriot testified that the fair market value of a 50% interest in SIS as of December 31, 2017, was worth $830,483.00. He allocated 47% to SIS's total goodwill attributable to Mr. Fair's personal goodwill. He applied a 25% liquidity/marketability discount, reasoning that if Mr. Fair sold the business, he would experience a similar discount on the sale price. Mr. Theriot also reasoned that Ms. Fair only owned half of SIS and analogized her to a minority owner such

---

[8] Mr. Field's report states:

**Consideration of Valuation Adjustments**
In the valuation of a business or business ownership interest under the fair market value standard, valuation theory calls for the consideration of adjustments for lack of control, lack of marketability, or lack of liquidity depending on the facts and circumstances, level of value, and attributes of the ownership interest. However, it is our understanding that certain courts may take a different view of these adjustments of value under the statutory definition of fair market value. To assist the trier of fact, we have estimated the value of the Subject Interest including and excluding consideration of relevant valuation adjustments (i.e. discount for lack of liquidity). This determination is subject to the trier of fact's interpretation of the facts and circumstances herein and relevant jurisprudence.

[9] Mr. Theriot is a certified public accountant and a certified forensic accountant. He has a Master of Science in accounting degree and a Bachelor of Science in accounting degree and is the managing partner of the public accounting firm of Malcolm M. Dienes, LLC. He is a Certified Forensic Accountant and is certified in Financial Forensics.

9

that her interest should be discounted another 10%. Her half-interest was valued at $415,241.00.

Mr. Theriot testified that in valuing SIS as of December 31, 2017, using the income approach, specifically the capitalization of earnings method, he used a 15.99% capitalization rate. According to Mr. Theriot, the minority discount he applied reflects a lack of control because an ownership interest of 50% or less cannot demand its share of the underlying net assets, cash flows, or impose business strategies. Mr. Theriot testified that even where 100% of a company is valued, "[t]here are certainly cases where minority interest discounts have applied." As to the 25% marketability discount Mr. Theriot also applied, his report stated that the marketability discount related to ability to convert the business ownership interest to cash quickly with minimum transaction and administrative costs in so doing and with a high degree of certainty of realizing the expected amount of net proceeds. To determine the marketability discount, Mr. Theriot compared SIS to two companies with financial characteristics most similar to it. Mr. Theriot testified that a valuation that did not offer a marketability discount would not be a fair market valuation of SIS in his opinion.

Both experts testified about their determination of an appropriate goodwill discount. Ms. Fair presented the testimony of Chad W. Kendell, the General Electric representative who had supervised Mr. Fair for fifteen years and who decided whether to renew Mr. Fair's contract. Mr. Kendell testified that he hoped Mr. Fair and SIS would continue to distribute and that there was no indication that SIS's contract would not be renewed. Mr. Fair testified that he did not intend to retire or "to step aside." Mr. Kendell testified that if he had to replace Mr. Fair, he had six to eight people in mind. Mr. Kendell described Mr. Fair as "exceptional at taking a very complicated process to sell, as well as a complicated product and procedures,

and adapting that message to fit the – the sophistication of the person he's talking to." He also testified that GE used Mr. Fair on a national basis to assist other distributorships and that he "continually receive[d] praise from his people for his ability to help them."

Mr. Field testified that in determining a goodwill discount of 10-30%, he considered that Mr. Fair was very successful, had a great reputation with GE, and was a proven leader with a specific background as to the machines he was selling along with years of knowledge.[10] When explaining factors offsetting a higher goodwill percentage, he testified that the contract with GE was in SIS's name and that SIS was selling a GE product with GE's reputation and an exclusive distributorship. Mr. Field also testified that SIS had a workforce in place with noncompete agreements such that if Mr. Fair were removed, the business would still be healthy. Mr. Field stated that SIS's corporate contract with GE showed that the company could "change hands" from Mr. Fair, although he did consider that Mr. Kendell had never seen a transfer situation of this company.[11] Mr. Field opined that 20% was a reasonable figure for goodwill.

Mr. Theriot testified that he used the multiple attribute utility model (MUM) for valuing goodwill, which differentiates between enterprise goodwill, which adheres to the company, and personal goodwill, which does not.[12] Mr. Theriot gave great weight in his goodwill calculation to the existence of Mr. Fair's securing the

---

[10] When Mr. Field was asked if he had done dozens of goodwill analyses, he answered affirmatively, adding "at least 20." He testified that he had arrived at a goodwill discount greater than 10-30% where a solo practicing professional such as an attorney was involved.

[11] The agreement states, "[n]either this Agreement nor any rights or obligations herewith may be sold, transferred, conveyed or otherwise assigned by a party without the advance written consent of the other party (which will not be unreasonably withheld) and any actual or attempted sale, transfer, conveyance or assignment will be void and of no force or effect whatsoever."

[12] When Mr. Theriot was asked if he had only done two or three personal goodwill calculations that were either medical or legal professional practices, he answered affirmatively. He had not done a personal goodwill calculation such as was present in this case.

11

contract for SIS with GE, that GE called on Mr. Fair to train other GE representatives and managers, and Mr. Fair's training of his own work force. Mr. Theriot believed that the goodwill could be stronger than 47% based on his "interview with Mr. Kendell, and then his testimony, just –he was very adamant that these companies don't transfer easily." However, Mr. Kendell at trial testified that no one had approached him about purchasing a distributorship and that it would be a "very unique situation for us to do that." When asked if the contractual provision providing for a transfer with GE's consent would be honored, Mr. Kendell agreed that the contract would be honored "if we were to do that."

When asked to compare Mr. Theriot's goodwill discount to his, Mr. Field testified that the methodology Mr. Theriot used was "really more tailored towards a professional services [sic], which is very common in goodwill." Mr. Field also testified that if the issues revolving around liquidity and marketability were already accounted for, they should not be accounted for again in personal goodwill. Mr. Field also testified that Mr. Theriot inappropriately accounted for goodwill in several different places, such as the cost of capital and the marketability component, in reducing SIS's value.

The trial court issued detailed oral reasons for judgment as to the valuation of SIS, stating:

> Three of the primary factors are the minority discount, the marketability or liquidity discount, and the personal goodwill discount.
> The court wants to point out that in the Louisiana Supreme Court in the **Cannon versus Bertrand** case ruled that such discounts need to be used sparingly and only when the fact[s] support their use. The court [weighed] both experts['] testimony in determining whether or not to apply these discounts to the value of SIS. And again, I think as Mr. Theriot and Mr. Field testified; business valuation methods are not an exact science, they're basically guides to determine a fair market value. Given the dynamics of businesses and business practices, factoring in circumstances that may be unique to the parties, [an] inflexible formula for determining the value of business is not practical.

First, with regard to the minority discount. I don't even know why we had this conversation. It's 100 percent of the ownership of the business. There is no minority. ... A minority discount is applied when valuing a minority share of a business. The Fair[s] jointly own 100 percent of this business. This business is going to go 100 percent to [Mr.] Fair. So, there is no minority discount, there is no lack of control. That's not an issue. So, the minority discount is unwarranted.

The liquidity or marketability discount, based on Mr. Fair's testimony, he plans to continue to work for SIS until death. He has no plans to sell the business. There's a clause in the business contract to allow the sale transfer assignment with the approval of GE OEC, but this has not happened yet, I don't think for any of their businesses. The court is not going to apply a liquidity or marketability discount. It's inequitable to apply a discount to the market value when it's not for sale, and never will be for sale. It's just like giving one party a windfall for no particular reason.

With regard to personal goodwill, that's the main--main controlling factor here. ...

I'm completely convinced that [Mr. Fair] is excellent at what he does, he's an excellent salesman. ... [Mr. Kendell] testified from GE, said that he's, like, one of their top three.[13] He's enthusiastic about his product, he has good mannerism[s], he's easy to understand. I can see how people would buy things from him. He has a very good reputation and a good relationship with GE, that weighs in his favor in the personal [goodwill]. He has a good background as a sales rep.

In his past work -- in his past work, he did work on these machines, which actually make him even more valued. On the other hand, there's 18 of these distributorships in the United States, so clearly persons other than Mr. Fair can successfully run distributorships. GE brand and reputation. If you want a GE C-arm, you have to buy it from Mr. Fair, he has exclusive territory. GE has the follow up services that they provide. Mr. Fair has ... seven full time, and one part time sales representative[s] working under him that presumably all have non-compete agreements.

So, there is goodwill, and the court did elect to apply the goodwill discount. The court is going to elect to apply that at 25 percent. So, what I did for calculation purposes, I did accept Mr. Field[']s valuation due to numerous factors that were brought up today. I took the 2.4 million and I used the 2017 information to derive at a discount of five hundred forty-six thousand six hundred three dollars and twenty-five cents ($546,603.25). This leave[s] the value of the business at one million eight hundred fifty-three thousand three hundred ninety-six dollars and twenty-five cents ($1,853,396.25). One half of that amount is nine hundred twenty-six thousand six hundred ninety-eight dollars and thirteen cents ($926,698.13), and that is Ms. Fair's interest in this business.

(Footnote added.)

---

[13] Mr. Kendell actually testified that he considered Mr. Fair to be in the "upper third" of eighteen distributors. Mr. Fair testified that he was one of five distributors on the distributorship council for the surgery division Mr. Kendell oversaw.

Mr. Fair contends that the valuation of SIS should have been more discounted by personal goodwill and heavily discounted due to lack of liquidity or lack of marketability. Mr. Fair asserts that SIS was a closely held business with only one "customer" which owns no distribution right, whose distributorship contract must be renewed yearly, which cannot be sold or even transferred absent written consent of GE, and whose key employees are subject to non-compete restrictions upon termination of the distributorship.

Ms. Fair contends that a liquidity discount is not supported by the evidence or jurisprudence. She argues that Mr. Theriot, Mr. Fair's expert, lacked credibility and his 25% marketability discount was not supported because SIS was not being sold.

In its reasons for judgment, the district court referred to the Louisiana Supreme Court's statement in **Cannon v. Bertrand**, 2008-1073 (La. 1/21/09), 2 So.3d 393, 396, "Minority discounts and other discounts, such as for lack of marketability, may have a place in our law; however, such discounts must be used sparingly and only when the facts support their use." In **Cannon**, one of three members of a limited liability corporation informed the other two that he wanted to withdraw, and then filed suit to have the value of his one-third share determined. **Id.** at 393-94. The plaintiff's expert suggested no minority discount, the defendants' expert suggested 75%, and the district court applied 35%, which the appellate court affirmed. **Id.** at 394. The supreme court held that under the particular facts of the case, the district court abused its discretion in applying a discount. **Id.** at 396. In **Cannon**, the buyers of the partnership interest at issue were the two remaining partners in the partnership. **Id.** at 396. The court explained that those two partners would not be subject to a lack of control as would a third party, as each would have an equal say in the control of the partnership. **Id.** The court also stated that because

14

the partners had already determined to purchase the partnership share themselves by opting to continue the partnership and avoid liquidation, lack of marketability was not an issue. **Id.** Lastly, the court commented that discounting the market value of the partnership's property would be inequitable because the withdrawing partner should not be penalized for doing something the law allowed him to do, and the remaining partners should not realize a windfall profit at his expense. **Id.** at 396-97.

Mr. Fair contends that **Cannon** is not applicable to this case. We disagree. As in **Cannon**, the court carefully considered the facts of the case in determining whether to apply any discounts. The court's reasons state that, as was the case in **Cannon**, a minority discount was unwarranted because there would be no lack of control of SIS after the partition. Similarly, the court did not apply the liquidity or marketability discount because SIS was not going to be sold. Mr. Fair contends that this case is analogous to **Trahan**, 43 So.3d at 230-31, where this court found that the district court did not abuse its discretion in applying a 20% marketability discount to value a spouse's business interest. However, the facts and circumstances involved in **Trahan** are distinguishable from the facts of this case. The company at issue in **Trahan** was a small, closely-held company where Mr. Trahan was the majority owner, but he and a minority owner person worked closely together to make decisions for the company. The expert found to be more credible advised that the marketability discount was mandatory, but even the opposing expert conceded the discount might be appropriate. In this case, the parties' experts did not agree and the evidence clearly established that Mr. Fair did not want to sell SIS. Moreover, Mr. Fair was going to own the entire company after he acquired Ms. Fair's interest in SIS.

Mr. Fair also contends that this case is analogous to **Lanza v. Lanza**, 2004-1314 (La. 3/2/05), 898 So.2d 280. However, the **Lanza** case is not analogous

15

because in **Lanza**, the supreme court held in part that the State Farm Agency the insurance agent spouse operated was not community property subject to partition. **Id.** at 281. The court upheld the determination that the agency was a non-entity and not a thing subject to partition. **Id.** at 284. In determining that the agency was a non-entity, the court stated initially as part of its reasons that the agent spouse had no ownership interest in the agency pursuant to the agreement between him and State Farm. **Id.** at 283. The court in **Lanza** also considered whether the agency was a community enterprise under La. C.C. art. 2369.3, which imposes a duty to preserve and to manage prudently former community property under the control of a spouse. **Id.** at 285. The supreme court rejected that claim because the community enterprise still had to qualify as property. **Id.** The court noted that the spouse seeking compensation for the agency had not made a claim to the agency's assets or goodwill value. **Id.** In this case, unlike **Lanza**, SIS is an incorporated entity, is community property, and is subject to partition.

Ms. Fair cites several cases where the appellate courts upheld the district court's valuation without a marketability discount. See **Schoeffler v. Schoeffler,** 2021-21 (La. App. 3 Cir. 10/13/21), 2021 WL 4772327 at *4; **Nesbitt v. Nesbitt,** 44,413 (La. App. 2 Cir. 6/24/09), 15 So.3d 1229, 1232, writs denied, 2009-1649, 2009-1729 (La. 10/16/09), 19 So.3d 483, 484; **Mexic v. Mexic,** 577 So.2d 1046, 1050 (La. App. 4 Cir. 1991). She also cites **Head v. Head**, 30,585 (La. App. 2 Cir. 5/22/98), 714 So.2d 231, 238, where the appellate court found that the district court had improperly discounted the value of the family business for lack of marketability. We find no abuse of discretion in the court's failure to apply a marketability or liquidity discount in this case.

16

As to Mr. Fair's contention that the court abused its discretion in applying a goodwill discount of 25%, we initially note that La. R.S. 9:2801.2 specifically provides:

> In a proceeding to partition the community, the court may include, in the valuation of any community-owned corporate, commercial, or professional business, the goodwill of the business. However, that portion of the goodwill attributable to any personal quality of the spouse awarded the business shall not be included in the valuation of a business.

The court did not abuse its discretion in using a goodwill discount of 25%. In its reasons for judgment it articulated that it considered numerous factors, including Mr. Fair's excellence in his position as well as the fact that the GE product his company sold dominated the market due to its quality and GE's reputation. We find no merit to Mr. Fair's contention that goodwill was undervalued.

Having thoroughly reviewed the evidence and expert testimony, we find no abuse of the trial court's discretion in finding Mr. Field's fair market valuation of SIS to be the appropriate fair market value of SIS based on the facts and circumstances of this case. Thus, Mr. Fair's first assignment of error regarding the court's alleged abuse of discretion in its application of expert witness evidence in valuing his interest in SIS is without merit.

## GAINS IN IRA ACCOUNT

In his second assignment of error, Mr. Fair contends that the court erred in failing to award him the gains or losses after the community terminated from the $27,082.68 portion of the Morgan Stanley IRA credited to him as his separate property. The March 3, 2021 judgment specifically states that Mr. Fair "is not entitled to the gains or losses calculated from the date of community termination [April 19, 2016] to [the] present [March 3, 2021]. The [$27,082.68] credit awarded

17

shall accordingly be applied as of the approximate date of the account's division, with the remaining balance divided in-kind equally between the Parties."

In its reasons for judgment concerning its initial ruling that Mr. Fair's contributions to the Morgan Stanley IRA were separate property, the court stated:

> The parties opened an IRA account with Morgan Stanley during the marriage. ... The contributions to open the account sometime in 2011 or prior were $27,082.68. Mr. Fair had an IRA with Schwab prior to the marriage that had a total account value of $39,078.16 on January 31, 1998, just eight months after the marriage. Mr. Fair testified that there were no contributions to the Schwab account from the time he opened it until [the] marriage and then [he] made no further contributions during the marriage. Mr. Fair testified that the funds from the Schwab account were used to open the Morgan Stanley account. The Court believes his testimony to be credible.

In his testimony regarding the Morgan Stanley IRA during the marriage, Mr. Fair admitted that, to the extent the assets he originally invested existed, they were not in the same securities or investments as reflected on the January 31, 1998 Schwab statement. Mr. Fair also answered affirmatively when asked "And there [were] no transactions, to or for, other than in –within the investments?" Mr. Fair answered that he had no documentation or knowledge to show the proportion of the Morgan Stanley account attributable to reinvested dividends or growth on those dividends from the $27,082.68 investment.[14] Ms. Fair's expert, Mr. Field, testified that based on the information provided, he could not trace the dividends from Mr. Fair's initial investment as he had done with Ms. Fair's initial investment in her IBM stock purchase account. The Morgan Stanley IRA was community property and had an approximate balance of $170,678.84 at the time of trial and $106,749.39 on April 30, 2016.

---

[14] Mr. Fair also introduced Morgan Stanley statements covering December 1-31 for the years 2015 through 2019; April 1-30, 2016; and October 1-31, 2020. The balance on the 2020 statement is $140,428.57.

At a second hearing, Mr. Fair contended that Ms. Fair was not entitled to the gains and losses on the $27,082.68 credit after the termination of the community.[15] In oral reasons for judgment, the court stated:

> With regard to the Morgan Stanley account, I think the prior judgment of the court is clear, and that that account is to be divided after taking out that exact figure that I listed there. As I also said previously, the proof offered up on that account was flimsy at best, but I elected to go ahead and give the reimbursement. I am not going to now go back and try to calculate what type of interest growth or decrease in value is associated with that figure.

Mr. Fair contends that the court erred in classifying as community property the fruits of his separate property after the termination of the community property regime. He contends that after the community was terminated, the fruits of his separate property were not community property.

Mr. Fair relies solely on La. C.C. arts. 2338 and 2339 to support his contention. During the community regime, La. C.C. art. 2339 generally provides that "[t]he natural and civil fruits of the separate property of a spouse ... are community property" unless the owner spouse has filed a declaration reserving them as separate property. Thus, any fruits of the $27,082.68 separate property of Mr. Fair were community property during the community regime.[16] After termination of the community, provisions governing co-ownership apply to former community

---

[15] During argument of the issue, the court commented, "The fact that I gave this credit, was, I mean-- ... he should probably consider that a gift because [he] didn't prove it."

[16] Louisiana Civil Code article 551 provides in pertinent part, "Civil fruits are revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions." We note that Mr. Fair did not challenge the court's characterization of the remaining balance in the Morgan Stanley IRA as community property. The Louisiana Supreme Court held that under former La. C.C. art. 2402, cash dividends from separate stock are fruits and, hence, community, but that stock dividends and splits were separate property. **Daigre v. Daigre**, 228 La. 682, 694, 83 So.2d 900, 904 (1955); **Reeves v. Reeves**, 607 So.2d 626, 632 (La. App. 2 Cir.), writ denied, 608 So.2d 1010 (La. 1992). The Morgan Stanley statements show asset allocation, which includes accrued interest, and consists of "Cash, BDP [Bank Deposit Program], MMFs [Money Market Funds]." The statements also show the investments in stocks, dividends, and interest. The statement for April 1-30, 2016, shows a stock dividend, but the other statements in evidence do not appear to show any stock dividends.

property, unless otherwise provided by law or juridical act. See La. C.C. art. 2369.1. In specific instances, the Louisiana Civil Code provides otherwise when dealing with former community property where the community terminates for a cause other than death or a judgment of declaration of death. See La. C.C. art. 2369, Revision Comments-1995(b) referring to La. C.C. arts. 2369.2-2369.8. Louisiana Civil Code article 2369.2 provides, "Each spouse owns an undivided one-half interest in former community property and its fruits and products."[17]

Because the court determined that the $27,082.68 was Mr. Fair's separate property and Ms. Fair did not appeal that determination, the court erred in not taking that finding into account insofar as the parties' interests after the termination of the community. While each party owns an undivided one-half interest in former community property and its fruits under La. C.C. art. 2369.2, the $27,082.68 amount was not former community property. After the termination of the community, Ms. Fair did not own an interest in the gains and losses from Mr. Fair's separate property.

To challenge Mr. Fair's contention, Ms. Fair relies on cases where the courts have held that, when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds, then all of the funds are characterized as community funds. See **Talbot v. Talbot**, 2003-0814 (La. 12/12/03), 864 So.2d 590, 602. However, that principle is not applicable to this case where the court determined that the original contribution that included the $27,082.68 amount was separate property and could be identified and differentiated from the community funds in the Morgan Stanley IRA account. Once the court made that determination, that property retained its characteristic as separate property after the termination date.

---

[17] Louisiana Civil Code article 798 states, in pertinent part, "Co-owners share the fruits and products of the thing held in indivision in proportion to their ownership."

20

Ms. Fair also contends that the $27,082.68 credit is analogous to a reimbursement claim under La. C.C. art. 2367. She argues that because Mr. Fair could not trace his separate property contribution, he did not establish the existence of separate property, but only that he had contributed funds towards community property. Louisiana Civil Code article 2367 states, in pertinent part:

> If separate property of a spouse has been used during the existence of the community property regime for the acquisition, use, improvement, or benefit of community property, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.

Because Ms. Fair did not raise this issue in the district court, this court will not consider an issue raised for the first time on appeal. See **Dougherty v. Dougherty**, 2021-0433 (La. App. 1 Cir. 3/29/22), ___ So.3d ___, ___.

Therefore, Mr. Fair's second assignment of error has merit. The evidence was clear that the $27,082.68 was Mr. Fair's separate property. The evidence also showed that the Morgan Stanley IRA account was $106,749.39 when the community was terminated and had increased to $170,678.84 at the time of trial. During the community, the fruits from the separate property were community property, but after the termination, they were not. Therefore, the court erred in failing to award Mr. Fair the gains or losses after the community terminated on the separate property it had awarded him. Because the record is not sufficient for this court to render judgment, the matter is remanded for the district court to determine the gains and losses on Mr. Fair's $27,082.68 separate property credit in his Morgan Stanley IRA account, calculated from the date of community termination, April 19, 2016, until the date of judgment. See **McMorris v. McMorris**, 94-0590 (La. App. 1 Cir. 4/10/95), 654 So. 2d 742, 748.

21

## REIMBURSEMENT OF ADDITIONAL SALARY PAYMENTS

In Mr. Fair's third assignment of error, he contends that the court erred in awarding Ms. Fair reimbursement in the amount of $156,000.00 for certain additional salary payments that SIS made to Mr. Fair in 2017 and 2018.

Ms. Fair contends that SIS was community property and upon the termination of the community regime, each party became an equal co-owner. See La. C.C. arts. 798, 2369.2. Therefore, to the extent surplus funds were available from SIS for distribution during the years 2017 and 2018 (after the termination of the community regime), she contends that she was entitled to her 50% share. Ms. Fair contended that Mr. Fair reduced SIS's profitability over the two years that SIS was awaiting partition by paying himself a higher salary. She contends that Mr. Fair paid himself an additional $170,000.00 in 2017 and an additional $241,000.00 in 2018 for a total increase of $411,000.00.[18] In recognition of $99,000.00 in support payments Mr. Fair made to her, Ms. Fair claimed he improperly increased his salary by an adjusted total of $312,000.00. Since she was a half-owner of SIS, Ms. Fair contended that Mr. Fair's salary increases reduced her share of SIS profits by $156,000.00.

At the trial, both parties testified that they shared the profits of SIS equally and were paid the same salaries from 2004 or 2005 until Ms. Fair's termination in 2017.[19] Both parties stated that in 2015, their gross pay was $253,000.00 each. Ms. Fair testified that after she was terminated in May of 2017, Mr. Fair stopped paying her and "paid himself the – whatever he had been paying me, he paid himself all of the salary that I had had, in addition to what he had been taking." In 2017, her gross pay was $107,000.00 and his was $423,000.00. Ms. Fair stated that she did not

---

[18] Ms. Fair introduced into evidence the parties W-2's for 2015, 2016, and 2017. The gross wages for Ms. Fair were $253,000.00 in 2015; $291,757.00 in 2016; and $107,000.00 in 2017. The gross wages for Mr. Fair were $253,000.00 in 2015; $373,358.68 in 2016; and $423,000.00 in 2017.

[19] Mr. Fair testified that they were paid equal salaries to maximize their 401(k)s and tax savings.

22

receive a salary from SIS in 2018. Mr. Fair testified that his pay for 2018 was $19,000.00 for 26 pay periods, which would total $494,000.00.

Mr. Fair testified that after he terminated Ms. Fair in May of 2017, he paid her $19,000.00 monthly for six to nine months in after-tax money from his earnings of $38,000.00 monthly as he was required to by a child and spousal support judgment. He later testified that the gross amount was $19,000.00 with the after-tax amount being $12,700.00. When asked if she received actual payments of $99,000.00 after her termination, he testified that he didn't know what the amount was, but it was possible it could be the right number. He also testified that he advanced two distributions of approximately $75,000.00 each to Ms. Fair in July and October of 2017; however, the record contains no documentation of these payments to Ms. Fair. When asked if SIS in paying more in salaries reduced its profits, Mr. Fair replied affirmatively.

In the court's reasons for judgment regarding Ms. Fair's reimbursement request, the court stated as follows:

> With regard to the request that Mr. Fair reimburse Ms. Fair, because he overpaid his salary to himself -- the experts both agreed that the salary for a person who does what Mr. Fair does is a hundred and fifty-five thousand (155,000). I did not use that figure. It seems -- it just seemed ridiculously low to me. I mean, it really did. So, I used the figure that he was paying himself previously, the two hundred fifty-three thousand (253,000), which resulted – what happens is, he's in a fiduciary relationship to Ms. Fair. He had possession and control of the business, and he's making the decisions. If he elects to pay himself more, thereby decreasing the profits of the business, decreasing the distributions to Ms. Fair. I backed out the distributions that she did receive and this results in a reimbursement due to Darlene Fair in the amount of one hundred and fifty-six thousand dollars ($156,000.00).

Mr. Fair contends that the reimbursement is improper because Ms. Fair was paid a salary for part of 2017, she was paid the same distribution as he was for 2017, she was also paid by him monthly with after-tax money, and she failed to present evidence regarding the distribution to which she would have been entitled in 2018.

23

Ms. Fair contends that, to the extent surplus funds were available from SIS for distribution during the years 2017 and 2018, she was entitled to her 50% share. Ms. Fair contended that Mr. Fair reduced SIS's profitability over the two years that SIS was awaiting partition by paying himself a higher salary.

Mr. Fair offered no evidence to support his contentions that Ms. Fair was paid a distribution. Moreover, the court credited Ms. Fair with the amount Mr. Fair paid her when it credited $99,000.00 against the reimbursement claim. The evidence showed that Mr. Fair unilaterally increased his salary substantially, and he did not present any evidence to justify a salary increase. La. C.C. art. 2369.3 states, "A spouse has a duty to preserve and to manage prudently former community property under his control in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect."[20] Mr. Fair admitted that paying himself a higher salary would reduce SIS's profits. While Mr. Fair had the right to terminate Ms. Fair as an employee, as co-owner of community property, she was entitled to her interest in it. Therefore, Mr. Fair's third assignment of error has no merit.

## CONCLUSION

For the foregoing reasons, this court affirms the judgment of the district court signed on April 15, 2021, which incorporated the previous judgments of March 13, 2019, June 16, 2020, and March 3, 2021, in all respects except for that portion of the

---

[20] The 1995 comments (a) to La. C.C. art. 2369.3 states, in pertinent part:

> This Article also imposes a higher standard of care in managing and maintaining such former community property than the standard imposed during the marriage for managing community property. See C.C. Art. 2354 (rev. 1979). The reason for imposing a higher standard of care in managing former community property is that, after termination of the community property regime, the law no longer assumes that a spouse who has former community property under his control will act in the best interest of both spouses in managing it.

March 3, 2021 judgment and the June 16, 2020 judgment holding that Steven Joseph Fair was not entitled to the gains or losses calculated from the date of community termination to the present as to the $27,082.68 credit awarded to him in connection with the partition of the Morgan Stanley IRA account. That portion of the March 3, 2021 and June 16, 2020 judgments is reversed insofar as it held that the credit awarded to Steven Fair was to be applied as of the date of the account's division with the remaining balance divided in-kind equally between the parties. This matter is remanded for further proceedings consistent with this opinion. Steven Fair is to pay two-thirds and Darlene Morris Fair one-third of the costs of this appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**